**UNITED STATES of America,
Plaintiff,**

**v.**

**LOCAL NO. 357 OF the INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, A.F.L.–C.I.O., Joint Apprenticeship and Training Committee for the Electrical Industry, Defendants.**

**Civ. No. LV–1112.**

United States District Court, D. Nevada.

Oct. 18, 1972.

Decrees Feb. 27, 1973.

V. DeVoe Heaton, U. S. Atty., Las Vegas, Nev., Stuart P. Herman, Dept. of Justice, Washington, D. C., for plaintiff.

Lee & Beasey, Las Vegas, Nev., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROGER D. FOLEY, Chief Judge.

*Defendant Local 357*

1. Local Union No. 357 of the International Brotherhood of Electrical Workers (hereinafter Local 357) is an unincorporated association of approximately 1500 members working in the

electrical industry in the Las Vegas area. Its principal office is in Las Vegas, Nevada (Pretrial Order, paragraph III(d)). From 1950 until July 1969, the Business Manager or principal administrative official of Local 357 was Ralph Leigon. At the time of the trial, that position was held by Ralph Gault.

2. Local 357 is composed of seven separate units which represent workers in various aspects of the electrical trade. This case is concerned with the Construction and Hotel Maintenance Unit (hereinafter Construction Unit) of Local 357.

3. Of the nearly 1500 members in the union, approximately 500 are in the Construction Unit. As of January 1, 1968, there were no Negroes in that unit nor had there ever been for at least the preceding 10 years. After this lawsuit was filed on February 19, 1968, a Negro was admitted to this unit as a groundman member (Pretrial Order, paragraph III(q), (r) and (s)).

4. Members of the Construction Unit are broadly characterized as being either "inside" electricians or "outside" electricians. Formally, "inside" electricians are classified as: (a) wiremen, (b) shopmen, (c) welders, or (d) apprentices; and "outside" electricians are classified as: (a) linemen, (b) groundmen, (c) welders, or (d) apprentices.

5. Prior to 1963, there were no set standards for membership (Tr. 1301). In November 1963, standards for wiremen and shopmen membership were adopted providing:

"WHEREAS, the employment opportunities for the members of this Local Union engaged in the electrical construction industry fluctuates from time to time in direct relation to the total construction activity in progress within our jurisdiction, and

WHEREAS, the Local Union has no control or influence over the continually changing and irregular building and construction activity in our area, and

WHEREAS, the Local Union recognizes and accepts its obligation to the Electrical Contracting Industry to have available and provide upon reasonable notice the necessary numbers of qualified workmen, and

WHEREAS, the Local Union also recognizes its objective to secure stable employment for its members to the best of its ability, and

WHEREAS, it is the desire and intent of this Local Union to anticipate the expected growth of the Electrical Construction Industry in our area; to provide a fair and reasonable method of accepting and admitting new members to the Local Union concurrent with the anticipated needs of the Electrical Construction Industry, bearing in mind that a balance of available workmen compared to job opportunities is in the best interest of all,

NOW THEREFORE BE IT RESOLVED, that the following procedure shall be adopted as the policy of the Local Union:

1. All apprentices shall be accepted in accordance with the Joint Apprenticeship Training Program, the Local Union By-laws and the International Constitution.

2. A non-member of the I.B.E.W. employed in the jurisdiction of this Local Union under the Construction agreement for a period of twenty-four months out of thirty-six consecutive month period shall be eligible for admission as a Journeyman Shopman. He must have worked a minimum of Eight months of the required time in a general electrical contracting shop. After admission he will be required to maintain his Journeyman Shopman classification for a minimum period of Twenty-Four months during which time the Executive Board may require him to attend electrical study classes or devote a reasonable amount of time toward becoming a competent, informed electrical mechanic. Having satisfactorily completed these requirements he will be eligible to take the

Journeyman Wireman's Examination for the purpose of changing his classification.

3. A member with Twenty-Four or more months of continuous good standing in this Local Union and who is employed in the jurisdiction of this Local Union under the Construction agreement outside his regular classification will be eligible to change his classification to Journeyman Shopman. After his classification is changed he will be required to maintain his Journeyman Shopman classification for a minimum period of Twenty-Four months during which time the Executive Board may require him to attend electrical study classes or devote a reasonable amount of time toward becoming a competent, informed electrical mechanic. Having satisfactorily completed these requirements he will be eligible to take the Journeyman Wireman's examination for the purpose of changing his classification.

4. A traveling card member employed in the jurisdiction of this Local Union under the Construction agreement for a period of Twenty-Four months out of Thirty-Six consecutive month period shall be eligible to deposit his traveler's (card) in the Local Union. He must have worked a minimum of Eight months of the required time in a regular electrical Construction shop. His trade classification will be determined in accordance with the International Constitution.

5. In all events to be eligible to take the Journeyman's examination proof may be required to show the person has worked at the electrical construction industry at least five years which is the time required under the present Apprenticeship Training Program.

6. Based on the present membership of the Local Union currently employed in the electrical construction industry compared to the anticipated growth in the foreseeable future it is our best judgment that not more than a total of two qualified Journeymen per calendar month shall be accepted into the Local Union exclusive of the Apprenticeship Training Program.

7. Applicants for change of classification or deposit of traveling cards shall be considered strictly on a seniority basis of the total time worked in the jurisdiction of the Local Union.

8. Due consideration will be given from time to time for a complete review of the above policy so that it will be consistent with the anticipated needs of the industry and the best interests of the Local Union and its members.

9. Nothing in this policy shall be construed to conflict with any of the provisions of the Local Union By-laws or International Constitution." (Exhibit 56, page 200.)

6. Local 357, pursuant to collective bargaining agreements with electrical construction contractors, maintains an exclusive hiring hall for the referral of construction electricians (wiremen, linemen, etc.) to employers. Contractors are required to obtain electricians through the union hiring hall unless the union is unable to comply with a request for workers within forty-eight hours of that request (Pl.Ex. 43, pp. 3–4, Tr. 240–241).

7. Through the operation of its hiring hall, and because of its collective bargaining agreements with all of the principal electrical contractors in the area, Local 357 effectively controls the major portion of employment opportunities available for electrical construction workers in the Las Vegas area (Pretrial Order, paragraph III(f) ).

8. Prior to January 1959, Local 357 maintained only two books on which electricians were listed who sought work referrals. The first book was for "residents" of the Las Vegas area and the second book was for "travellers", or non-residents. In the 1964 collective bargaining agreement between Local 357 and the Southern Nevada Chapter of the National Electrical Contractors Associa-

tion (NECA), work referral groupings were established as follows:

"Group I: All applicants for employment who have four or more years' experience in the trade, are residents of the geographical area constituting the normal construction labor market, have passed a journeyman's examination given by a duly constituted Local Union of the I.B.E.W. and who have been employed for a period of at least one year in last four years under a collective bargaining agreement between the parties to this agreement.

Group II: All applicants for employment who have four or more years' experience in the trade and who have passed a journeyman's examination given by a duly constituted Local Union of the I.B.E.W.

Group III: All applicants for employment who have two or more years' experience in the trade, are residents of the geographical area constituting the normal labor market and who have been employed for at least six months in the last three years in the trade under a collecting bargaining agreement between the parties of this agreement.

Group IV: All applicants for employment who have worked at the trade for more than one year."

(Exhibit 45.)

In the 1969 collective bargaining agreement between Local 357 and NECA, work referral groupings were established as follows:

"GROUP I: All applicants for employment who have four or more year's experience in the trade, are residents of the geographical area constituting the normal construction labor market, have passed a journeyman wireman examination given by a duly constituted Local Union of the I.B.E.W. and who have been employed for a period of at least two years in the last four years under a collective bargaining agreement between the parties to this agreement.

GROUP II: All applicants for employment who have four or more years' experience in the trade, are residents of the geographical area constituting the normal construction labor market, have passed a journeyman's examination given by a duly constituted Local Union of the I.B.E.W. and who have been employed for a period of at least one year in last four years under a collective bargaining agreement between the parties to this agreement.

GROUP III: All applicants for employment who have four or more years' experience in the trade and who have passed a journeyman's examination given by a duly constituted Local Union of the I.B.E.W.

GROUP IV: All applicants for employment who have two or more years' experience in the trade, are residents of the geographical area constituting the normal labor market and who have been employed for at least six months in the last three years in the trade under a collective bargaining agreement between the parties of this agreement.

GROUP V: All applicants for employment who have worked at the trade for more than one year."

(Exhibit 43. Testimony of Leigon and Gault, Tr. 1297–1320.)

9. Despite the existence of the priority grouping system, Local 357 has frequently placed white applicants for referral in the highest priority group despite their lack of qualifications, both as to prior work experience and passing of an IBEW journeyman's examination. (Testimony of John Miller, Tr. 410–13; William Bunting, Tr. 290; Merlin North, Tr. 294–96; Kendal Barnum, Tr. 319–20; Lewis Jewett, Tr. 321–323; Roy Fluharty, Tr. 658; John Glore, Tr. 765; and Benjamin Garner, Tr. 200–03.)

10. In theory, an applicant for work need not be a member of Local 357 or any other union in order to be referred to work. Such an individual should be told by the union to sign the appropriate one of the referral "books" and, in turn, sent to work.

11. Based on the facts in paragraphs 12 to 22, this Court finds that Local 357

has discriminated against Negroes because of their race by failing and refusing to refer them to work.

12. Eugene Staten is a qualified Negro electrician licensed as a journeyman by the City of Las Vegas. Presently he is a detective with the Las Vegas Police Department. In 1962, he visited the union office four times in the months of January, February, March and May seeking membership and work referral. He was told that there were no openings and that the books were closed. On his visit in May 1962, Staten was simply told that the union was not accepting Negroes (Tr. 678–80). Contrasted with the experience of Staten is the treatment accorded whites such as Roy Fluharty who arrived in Las Vegas in 1961. He went to the union seeking work and was told to sign the out-of-work book. The next day he was referred to a job. Fluharty was later accepted as a member of Local 357 in 1963 (Tr. 659–60).

13. Eugene Staten returned to the office of Local 357 in 1968 to again seek work and was directed to see Mr. Leigon. On all of the occasions, Staten attempted to contact Leigon, he was out or unavailable. Staten has never been referred to work by Local 357 (Tr. 685–88).

14. Philip White is a qualified Negro electrician who is licensed as a journeyman by the City of Las Vegas. In 1958 or 1959, he went to the union hall seeking work. He received a hostile reception from other electricians in the hall and was not referred to work. White again sought work in 1960 and was told by the union dispatcher that he could not get on the out-of-work book (Tr. 360–65). In May or June of 1969, Philip White was hired directly by Reynolds Electrical Company as an electrician. At that time, he went to the union and was refused a referral slip (Tr. 367).

15. In contrast to the refusal of Local 357 to refer Philip White to work is the testimony of James Cavalieri, President of Local 357, who stated that work in Las Vegas for electricians was plentiful from 1957 to 1960 (Tr. 792, 797).

16. C. L. Strambler is a qualified Negro electrician who sought work referral through the union some time around July 1965. He was informed through Mr. Curry, Assistant Business Manager of the union, that he would first have to go through an apprenticeship program. He was not allowed to sign the out-of-work book (Tr. 180–81) despite the fact that the union's collective bargaining agreement in effect at that time deemed anyone with at least one year of electrical experience as eligible for referral (Pl.Ex. 45, p. 8–9). Strambler had more than four years' experience as an electrician doing both interior and exterior wiring when he applied for referral in 1965 (Tr. 180–81, 196–97) and was over apprenticeship age (Tr. 192, 864).

17. Albert Goff, a Negro, sought work through Local 357 on June 25, 1969. On this visit to the union hall, he was accompanied by officials of Reynolds Electric and had his name placed on the lineman book (Tr. 134–37; Pl.Ex. 39). Goff was not referred to work by the union but instead had to obtain employment by being hired directly by Reynolds Electric (Tr. 138, 141–42). The union in fact attempted to have Reynolds Electric cancel their request for a lineman at a time when Goff was the only one available through the union hall (Tr. 155–161).

18. Samuel Baynes is a qualified Negro electrician who has held many licenses including a City of Las Vegas master electrician's license (Tr. 332–33). He formerly was a member of IBEW Local 11 in Los Angeles (Tr. 327–330). Baynes sought work through Local 357 in May 1952. At that time he was told by the Business Manager that the union did not have any Negro electricians and he was not referred to work (Tr. 327–28). Baynes again contacted Local 357 in July 1955 and was told by the Business Manager that the time "wasn't yet quite right for Negro electricians" (Tr. 330–31).

19. In September 1967, Baynes returned to Local 357 seeking job referral. At that time, he was placed on Book III but, despite waiting for a two-month period, was not referred to work (Tr. 333, 336–37). Ralph Leigon, former Business Manager of Local 357, testified that he verified Baynes' membership in IBEW Local 11 and that on that basis he was eligible for placement on Book II (Tr. 357). In contrast, whites with less qualifications than Baynes were placed on Book I (Merlin North, Tr. 294–96; John Miller, Tr. 410–13; William Bunting, Tr. 290).

20. Roy Riller is a qualified Negro electrician who holds a Las Vegas journeyman's license (Tr. 164). He has been a resident of Las Vegas since 1940 (Tr. 163). In both 1942 and approximately 1946, Riller sought referral from Local 357 (Tr. 167, 171). He was told the first time that the books were closed (Tr. 167), and the second that the union was not ready to take Negroes. Due to these rejections, he subsequently has never sought referral through Local 357.

21. Philip White, C. L. Strambler, Albert Goff, Sam Douglas, Roy Riller, Earl McDonald, Lee Charles White and Rudolph Pittman, each of whom is a Negro electrician, are all presently employed by Reynolds Electric (the largest electrical contractor in Nevada), and are satisfactorily working as journeymen wiremen and linemen (Tr. 598–613).

22. Based on the facts in paragraphs 23 to 32, this Court finds that Local 357 has discriminated against Negroes because of their race by failing and refusing to accept them into membership.

23. Earl McDonald is a qualified Negro electrician who is licensed as a journeyman by the City of Las Vegas and was formerly a member of IBEW Local 11 in Los Angeles (Tr. 16–17). He initially applied for membership in Local 357 in 1958. His application was rejected because "10 per cent of members out of work" (Pl.Ex. 36, pp. 204–05). In the period from 1955 through 1969, union records do not reflect that any other individual was rejected on the basis of "members out of work" (Tr. 649). McDonald was never told of this rejection or the reason for it, or when to reapply (Tr. 37).

24. McDonald reapplied in 1961. His application was again rejected. The reason given was "need further background information as to his qualifications" (Pl.Ex. 36, p. 351). However, he was never requested to supply such information, nor was he told of his rejection despite writing twice to the union to inquire as to the status of his application (Tr. 54, 1335). In other cases, the practice of the union was not to require background resumes of people working locally (Tr. 1386). McDonald has worked as an electrician on union jobs in Las Vegas since 1957 (Tr. 24).

25. McDonald reapplied in 1967 and again received no response (Tr. 57–58). After this suit was filed, he was told that he had to submit a resume showing 15 years' experience (Tr. 59–60). Contrasted with this is the normal union requirement of four years' experience for journeyman wireman membership (Pl. Ex. 56, pp. 200–201).

26. Willie Bowens is a qualified Negro electrician licensed by the City of Las Vegas as a journeyman. He applied for membership in Local 357 in April 1966 (Tr. 416–18). Bowens was told by the Business Manager that his application had been denied (Tr. 420). Union records reveal that it was never even considered by the union Executive Board as is the normal practice with all other applications for membership (Tr. 1360). He then sent the union a registered letter (Pl.Ex. 48) but received no response (Tr. 423).

27. Bowens met again with Ralph Leigon in November 1966 and was instructed to send a letter asking to take a wireman exam (Tr. 424–425). No mention was made of further requirements (Tr. 425, 477). Bowens submitted a written request on November 9, 1966 (Pl.Ex. 49), but despite several phone calls to Leigon, he was not told that he

must submit a resume of his electrical experience until after he had filed a discrimination complaint against Local 357 with the Equal Employment Opportunity Commission (Tr. 433; Pl.Ex. 50).

28. Bowens subsequently gave Local 357 two resumes (Pl.Ex. 51, 53). His first was rejected despite a statement by Leigon that Bowens was as well qualified as whites who had been permitted to take the test, and that the resume was acceptable to the Business Manager but there were "rednecks" on the membership board to whom Bowens was not acceptable (Tr. 787–788).

Bowens has never received a response to his second resume, sent in July 1967 (Tr. 441–442). At time of trial according to Leigon, Bowens' application was still "pending" (Tr. 1358).

29. Jim Payne, a qualified Negro groundman, was taken to Local 357 by a representative of his employer, a union contractor, in 1965 or 1966, seeking groundman membership. He also went again by himself in 1967. Payne was not provided information on how to obtain membership on the first occasion and on the second the union would not even talk to him (Tr. 517–522). Groundman membership requires only employment with a union contractor (Tr. 702).

30. In 1969, three qualified Negroes, Albert Goff, Sam Baynes and Philip White, sought membership and were either given misinformation or ignored (Tr. 125, 339–340, 368–371).

31. Between 1960 and 1968, journeyman membership in Local 357's Construction Unit almost doubled (Pretrial Order, paragraph III(q)). None of the new members were Negro, even though fully qualified black electricians with work experience in Las Vegas extending back as much as 25 years were working and residing in the area.

32. The requirement that an applicant for membership be favorably voted upon by a majority of the members (Pl. Ex. 44, p. 70) has further discouraged qualified Negro electricians from seeking membership.

33. This inability of Negroes to obtain construction unit membership in Local 357 affects both the work opportunity available to them and the opportunity to have a say on matters affecting their terms and conditions of employment.

34. Local 357 has a reputation in the Las Vegas Negro community of not providing equal employment opportunities for Negroes (Testimony of Joe Neal, Tr. 473–474). This reputation has had the effect of deterring qualified Negro electricians from applying for membership and work opportunities offered by Local 357 (Testimony of Sam Douglas, Tr. 380).

*Defendant Joint Apprenticeship Training Committee for the Electrical Industry*

1. Defendant Joint Apprenticeship Training Committee for the Electrical Industry (hereinafter JATC) is a joint labor and management committee controlling electrical apprenticeships within the Las Vegas, Nevada, area. (Pretrial Order, paragraph III(c)). It is an unincorporated body composed of six members, of whom three are representatives of IBEW Local 357 and three are representing electrical contractors in the area. Its principal office is in Las Vegas, Nevada (Pretrial Order, paragraph III(g)).

2. The JATC administers and controls the apprenticeship program for the electrical trade in the Las Vegas area, including the selection of persons admitted to the program as apprentices (Pretrial Order, paragraph III(h)).

3. The three Local 357 members on the JATC are appointed by the union president (Tr. 793–794), and apprentices are dispatched to work through the Local 357 hiring hall (Tr. 797–798).

4. Apprentices, after working one year, automatically become apprentice members of the Local 357 Construction Unit and journeyman members upon completion of the apprenticeship pro-

gram (Pl.Ex. 44, p. 51, and Pl.Ex. 46–A, p. 22).

5. From the establishment of the apprenticeship program in 1952 until after this lawsuit was filed in February 1968, no Negro had ever been accepted as an apprentice (Pretrial Order, paragraph III(g) and(k)). Between 1961 and filing of this suit, 112 apprentices, all white, were selected (Pretrial Order, paragraph III(l) and (m)).

6. Based on the facts in paragraphs 7 through 13, this Court finds that the JATC historically has given preference to relatives of members of the Local 357 Construction Unit.

7. In 1964, the JATC passed a resolution limiting summer work to sons of contractors or union members (Pl.Ex. 61). Such summer work opportunity provides experience in the trade which is considered favorable by the JATC when the individual subsequently applies for a regular apprenticeship (Tr. 882, 1158, 1166, 1192).

8. The JATC has not followed the 1962 or 1967 written standards it adopted for selecting apprentices. This failure has been to the advantage of relatives of union members and contractors (Tr. Brief, p. 22–23).

9. Based on the facts in paragraphs 10 and 11, this Court finds that the JATC has followed a policy of limiting information on the electrical apprenticeship program to relatives and friends of union members and contractors and to the detriment of prospective Negro applicants.

10. Prior to at least 1966, information of apprenticeship opportunity was limited to announcements made to members of Local 357 and was dependent on word-of-mouth dissemination (Tr. 798), and until 1968 no general announcements through the press were undertaken (Tr. 883).

11. In 1968, announcements were placed in newspapers of general circulation and in the Las Vegas Voice, a newspaper directed at the Negro community (Tr. 884–885). In 1969, the JATC decided not to undertake any advertising (Tr. 1105). As a result, the number of Negro applicants fell from 25 in 1968 to 10 in 1969, while the number of white applications remained stable (Pl.Ex. 77).

12. Between 1965 and the filing of this lawsuit, the JATC selected 32 apprentices, of whom 19 were related to members or were themselves members of the Construction Unit of Local 357. Of the seven Construction Unit relatives rejected in those three years, three were subsequently accepted (Pretrial Order, paragraph III(l); Pl.Ex. 62, 63, 69).

13. The JATC determines the number of apprentices to be selected each year (Pl.Ex. 65, p. 5). Between 1961 and 1964, when no Negroes sought admission to the program, an average of 20 apprentices were selected. In the past five years, during which time there were Negro applicants, there has been an annual average of only 12.4 apprentices (Pretrial Order, paragraph III(l) and (m); Pl.Ex. 63). This decrease in apprentices has occurred despite an unfulfilled demand for both apprentice and journeyman electricians (Tr. 498, 621–622).

14. Based on the facts in paragraphs 15 through 18, this Court finds that the JATC has discriminated against Negro applicants for apprenticeship training because of their race by rejecting them while accepting less qualified whites.

15. Under the current selection procedures, JATC members execute "apprenticeship application rating forms" in four stages. First, it is determined if an applicant meets the minimum prerequisites. If these are satisfactory, the second stage of the process consists of evaluating the applicant's high school transcript and aptitude test scores and rating each applicant on his (a) general education, (b) math, (c) science, and (d) aptitude by checking for each category one of five boxes which run from "no background" to "excellent background". The third stage consists of an oral interview of the applicant during or just subsequent to which the members

of the JATC evaluate the applicant's (a) "interest in the trade", (b) "attitude", and (c) "personal traits" by again checking one of five boxes on the form.

No point scores are given for any of the categories rated during the second and third stage; instead, during the final stage each JATC member, on the basis of his overall impression of the applicant, assigns a final score on a scale of 10 to 120 to each applicant interviewed (Tr. 873).

16. JATC members in both 1967 and 1968 gave Negro applicants higher ratings than whites on the individual criteria rated during the second and third stages, yet gave the Negroes lower final scores (Pl.Ex. 72–72i).

17. Based on the following unrebutted expert testimony of Dr. Harold Edgerton, the Court finds that the JATC in its discretionary evaluation of applicants in 1967 discriminated against Negroes because of their race.

(a) Accepted whites were uniformly rated higher in final score than in the members' individual estimates of their qualifications while the Negroes were rated lower in final score than in the members' individual estimates of their qualifications (Tr. 1005–1009).

(b) The lower rating of Negroes by the JATC on the subjective criteria of "interest", "attitude" and "personality" (third stage), as compared to the objective criteria of education and aptitude (second stage), is explainable only in terms of race being an influencing factor (Tr. 1011–1014).

(c) Likewise, the disparity between Negroes and whites in the JATC's final scores (fourth stage) could have resulted only by considering race (Tr. 1063–1064, 1077–1078).

(d) Dr. Edgerton's independent evaluation of the ten white apprentices selected and the four rejected Negroes shows two of the Negroes, Edward Collins and Odell Nichols, were in the top ten (Tr. 1021–1022) and all four of the rejected Negroes were found as qualified as the least qualified white who was accepted into the program (Tr. 1021–1023).

18. Edward Collins was an exceptionally highly qualified Negro applicant who is interested and motivated in becoming an electrical apprentice (Tr. 1009–1011, 1015–1018, 1029, 1420–1422). He did not seek training in the electrical trade prior to 1967 because of the JATC's discriminatory reputation (Tr. 1425). The JATC members attempted to explain Collins' rejection in terms of his being unable to make up his mind as to what trade he wanted to follow as evidenced by his successful completion of a previous carpenter apprenticeship (Tr. 1143–1144, 1146, 1183, 1205–1206, 1229). However, that same year, a white completed his electrical apprenticeship which he had begun immediately upon completion of the same carpenter's apprenticeship program completed by Collins (Tr. 1441–1442).

19. The JATC has a reputation in the Las Vegas Negro community of not providing equal employment opportunities for Negroes (Testimony of Joe Neal, Tr. 473–474; Testimony of Odell Nichols, p. 945). This reputation has the effect of deterring Negro youths from applying for apprenticeships in the electrical trade (Testimony of Edward Collins, Tr. 1422).

## CONCLUSIONS OF LAW

### JURISDICTION

1. The Court has jurisdiction over the subject matter of this action and the parties to it by virtue of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. The Attorney General is authorized under Section 707(a) of the Act to institute suit to enjoin a pattern or practice of discrimination and request such relief as may be necessary to insure the full enjoyment of rights described in this title, 42 U.S.C. § 2000e–6(a).

### DISCRIMINATORY PRACTICES

2. It is an unlawful employment practice for a labor organization

(hereinafter referred to as a "union") to exclude Negroes, because of race or color, from union membership or from participation in a job referral system operated by the union. 42 U.S.C. § 2000e–2(c).

■ 3. It is an unlawful employment practice for a joint apprenticeship committee controlling apprenticeship training to discriminate against Negroes because of their race or color in admission to apprenticeship training programs. 42 U.S.C. § 2000e–2(d).

■ 4. Where union membership is virtually all white, it is unlawful for a union and its apprenticeship committee to limit information with regard to membership, work referral opportunities, and apprenticeship training to union members and other whites. Likewise, it is unlawful for a union and its apprenticeship committee to give false, misleading or incomplete information to Negroes; or to fail or refuse to inform Negroes of the procedures for application for membership, referral or apprenticeship training.

■■ 5. It is unlawful for a union or its apprenticeship committee to apply to Negroes on account of their race higher standards or more stringent procedures than are applied to whites. It is also unlawful for a union or apprenticeship committee which has discriminated on the basis of race in the past and which has applied few, if any, standards to whites seeking membership, work referral, or apprenticeship training, to apply to Negroes standards which are more stringent than those previously applied to whites.

■ 6. Qualifications required by a union or joint apprenticeship committee for membership, work referral, or apprenticeship training must bear a reasonable relation to skills required on the job. It is an individual's performance on the job that ultimately reveals his qualifications.

■ 7. It is unlawful for a union and joint apprenticeship committee with a history of discriminatory exclusion of Negroes to limit the number of journeymen and apprentices below what is required to fulfill the objectively determined needs of the industry. To do so limits the employment opportunities of Negroes.

■ 8. Where a union, which has engaged in racially discriminatory practices, exercises substantial control over construction job opportunities, it cannot require of Negroes as a condition of referral or membership, experience in the industry, or under a collective bargaining agreement. Since the union has prevented Negroes from acquiring such experience, to condition referral or membership on such experience or to grant referral priority on the basis of such experience would carry forward the effects of past discrimination. The same is true of requiring union membership as a condition of referral, or granting referral priority to union members.

■ 9. It is unlawful for virtually all-white unions and apprenticeship committees to give preference to relatives of union members and union contractors in admission to training programs or work referral since such a preference operates to restrict the employment opportunities of Negroes.

### EVIDENCE AND PROOF

■ 10. In proving a pattern or practice of racial discrimination, evidence of the discriminatory reputation of a union and its joint apprenticeship program is relevant and admissible. Such evidence is admissible to show how and why Negroes may have been discouraged from applying for membership, referral or apprenticeship, and how and why some of those who did apply may have been discouraged from pursuing their applications vigorously. It is also admissible because it has a direct bearing on the nature and extent of the "appropriate relief" to which the Government is entitled. Title VII imposes upon defendants an obligation to undertake affirmative action to vitiate the effects of a discriminatory reputation in the Negro community.

11. In the problem of racial discrimination, statistics often tell much, and Courts listen. Such statistics are particularly important in employment cases and furnish a basis for a finding of discrimination.

12. A pattern and practice, or policy, of discrimination is established where it can be shown that: (a) virtually all-white unions and apprenticeship committees have a discriminatory reputation in the Negro community; (b) that they have historically not had Negro members or participants in work referral and apprenticeship training; and (c) where it is demonstrated that there are a significant number of Negroes qualified for membership, work referral and apprenticeship training.

13. Where an all-white union and its apprenticeship committee exercise subjective and nonreviewable discretion in admitting members, referring individuals for work, and selecting apprentices, and it is shown that white applicants fare significantly better than Negro applicants, a prima facie inference of discrimination arises.

14. In cases under Title VII of the Civil Rights Act of 1964, the "intent" required by the statute may be inferred from the defendants' conduct. The statute requires only that a defendant meant to do what was done, that is, the act or practice must not be accidental.

15. Evidence of defendants' discriminatory practices occurring before the effective date of the Civil Rights Act of 1964 is admissible to show:

(a) Defendants' discriminatory intent, and to illuminate the purpose and effect of defendants' present policies.

(b) The existence of a long-standing pattern or practice extending back for many years and continuing to the present.

(c) That present policies or practices, racially neutral on their face, perpetuate the effects of past discrimination; and

(d) What relief is appropriate to correct the effects of past discrimination and to prevent future discrimination.

RELIEF

16. Where a defendant has engaged in a pattern or practice of discrimination on account of race, affirmative and mandatory relief is required in order to insure the full enjoyment of the right to equal employment opportunities. In ordering such relief, a court is not limited to parroting prohibitions but must order affirmative action which is appropriate to insure the full enjoyment of employment rights.

17. In such cases, the court has not only the power but the duty both to enjoin future discrimination and, as far as possible, to require the elimination of the continuing effects of past discrimination.

18. The court in ordering relief is not limited by Title VII's prohibition against preferential treatment, Section 703(j), 42 U.S.C. § 2000e-2(j), since that section has no application when a court seeks to correct the effects of unlawful and intentional racially discriminatory practices.

19. Such relief may include the ordering of remedial acts which will provide Negro participation in union membership, work referral, and apprenticeship training, in order to overcome the present effects of past discrimination. 42 U.S.C. § 2000e-6(a).

20. Where a union which maintains a hiring hall or work referral system has engaged in racially discriminatory practices, courts will order modifications in the referral system to insure that Negroes are not penalized for lack of experience in the industry or under collective bargaining agreements which

they were prevented from obtaining. Such modifications may take the form of: (a) ordering referral based on experience outside the industry or outside collective bargaining agreements; (b) ordering referral priority without regard to union membership or passage of a union examination; (c) ordering referral priority on a first-in first-out basis; or (d) ordering alternating Negro-white referral.

■ 21. Where a union or apprenticeship committee has engaged in discrimination on the basis of race, courts will order the adoption and publication of objective, reviewable standards and procedures for the selection of apprentices, admission of journeymen members, and referral of persons for work.

■ 22. Where a union or apprenticeship committee has engaged in a pattern or practice of unlawful discrimination, a thorough and effective program to publicize to the Negro community the fact that such discrimination has ceased is mandatory.

■ 23. Where a union or apprenticeship committee has engaged in a pattern or practice of discrimination, courts will require the maintenance of records and the submission of periodic reports which will make it possible to monitor the defendant's operations in those areas in which discrimination has been practiced.

## DECREE, DEFENDANT LOCAL No. 357, IBEW

The Court, having filed its findings of fact and conclusions of law on October 18, 1972, now enters the following decree.

It is hereby ordered, adjudged and decreed as follows:

1. The defendant Local No. 357, International Brotherhood of Electrical Workers, its officers, agents, employees, successors and all persons in active concert or participation with any of them in the administration of Local 357, shall not engage in any act or practice which has the purpose or effect of discriminating against an individual because of his race or color, or of perpetuating the effect of past practices which discriminate on the basis of race or color. They shall not exclude or expel any individual from membership, or limit, segregate or classify or otherwise adversely affect his status as an employee or as an applicant for employment because of such person's race or color. They shall receive and process applications, admit members, affiliate with employers, recruit electricians, refer for employment and otherwise administer all the affairs of Local 357 so as to provide opportunities to Negroes and other non-whites which are equal to those provided to whites.

*Work Referral, Construction and Hotel Maintenance Unit*

2. Local 357 shall require all persons who enter its office seeking employment in the electrical trade to sign a referral register giving their name, race, the date of registration, their skill classification (such as wireman, lineman, groundman) and their union affiliation, if any. All persons who enter the office to seek employment shall complete and file with the union an application for referral. Such application shall contain the name, address, telephone number, age, race, union affiliation, if any, skill classification, and a summary of the electrical experience of the applicant. The application shall then become a permanent part of the applicant's file, and shall be updated upon each subsequent request for referral by the applicant. The union shall place on the out-of-work list and refer to work only those persons who have on file such an application and have signed the referral register.

3. Each such applicant shall be placed in the highest referral priority group for which he qualifies. The qualifications for the groups and priority of referral shall be as established in the collective bargaining agreements to which the union is a party. However, any provisions of union constitutions,

bylaws and collective bargaining agreements notwithstanding:

(a) All Negro applicants who have experience in the electrical trade and are residents of the geographical area within which Local 357 has jurisdiction, shall have their names placed on the appropriate out-of-work list according to their skill classifications and shall be referred to work in the order of priority established in the current collective bargaining agreements.

(b) Experience in the electrical trade shall include electrical experience as an employee of a union or nonunion shop; self-employment as an electrician or electrical contractor; employment as a maintenance electrician; or other employment reasonably related to electrical work, including experience gained while in the Armed Services.

(c) Local 357 shall not require of Negro applicants for referral either the passage of an examination or any previous experience under any collective bargaining agreement as a condition for having their names placed on the appropriate out-of-work list or for being referred to work. In addition, Local 357 shall require no proof of such applicants' prior experience other than their own statement on an application for referral. The union shall retain the right to verify any relevant statement made.

4. Every three months Local 357 shall submit to the Court and the plaintiff the following information:

(a) A report showing the number of applicants for work referral within that period by race and skill classification, and the number of applicants actually referred during the period by race, skill classification, and priority group classification. The report shall also include the average number of hours worked by whites in each priority group.

(b) With regard to each Negro applicant, his name, address, telephone number, date of registration, skill classification, date of referral, employer to whom referred, and hours worked for each such employer shall be reported. In the event that a Negro applicant referred by the union is terminated by an employer, Local 357 shall determine the reason for such termination and include it in its report along with a copy of that person's application for employment.

(c) In the case of a Negro applicant who is not placed on the out-of-work list or who is not referred for work, Local 357 shall report his name, address, telephone number and the reason why he was not placed on the out-of-work list or referred to work and shall furnish a copy of his application for employment.

5. Local 357 shall maintain a register of all requests by employers for electrical workers. The register shall contain the name of the employer, the date and time of the request, the number of employees requested, the special skills required, and the names, race, union affiliation, if any, priority group classifications, and times and dates of referral of those persons sent to fill the request.

6. All records relating to the referral of applicants to work shall be maintained for five years, and shall be made available for inspection and copying by the plaintiff at reasonable intervals during regular business hours or at other mutually convenient times without further order of this Court.

*Membership, Construction and Hotel Maintenance Unit*

7. Union constitutions, bylaws and collective bargaining agreements notwithstanding, Local 357 may impose upon Negroes applying for membership requirements no more stringent than the following:

(a) Experience in the electrical trade, that is, experience as an employee of a union or nonunion shop; self-employment as an electrician or electrical contractor; employment as a maintenance electrician, or other employment reasonably related to electrical work, including experience gained in the Armed Services.

(b) Successful completion of the journeyman examination for the appropriate

skill classification conducted by Local 357.

(c) Residence in the geographical jurisdiction of the union at the time of application for membership.

8. Local 357 shall offer examinations for journeyman membership in each skill classification at least once every three months whenever there are applicants for journeyman membership. Each applicant shall be given at least one month's written notice of the date and place of examination; the nature and general description of the content of the examination; and the name of any texts or other materials which would be helpful in preparing for the examination. Any examination given shall be no more stringent than those given by Local 357 in the past five years.

9. Local 357 shall admit Negro applicants who meet the above qualifications into full membership in the union without the prior approval of any officer, board, committee or the membership of Local 357.

10. Local 357 shall not alter or change the employment or referral rights of a Negro applicant, based on such individual's failure to achieve a passing grade on the membership examination.

11. Every three months Local 357 shall report to the Court and the plaintiff the name, address, race, date of application and classification of each applicant for membership, and the action taken with respect to him. Local 357 shall maintain for three years after any examination complete records of the examination, including, but not limited to, all applications for membership, copies of all notices sent to applicants, copies of any replies received from applicants, and copies of the examination administered and answer sheets for the examination. Such records shall be made available for inspection and copying by plaintiff upon reasonable intervals during regularly scheduled business hours or at other mutually convenient times without further order of this Court.

12. Local 357 shall prepare a brief written statement describing the operation of its work referral system and its membership requirements for Negroes. The various employment opportunities shall be described and the current rate of pay shall be set forth. It shall also explain that it is not necessary to be a member of Local 357 in order to be referred to work. The nondiscriminatory operation of the union shall be stressed. A copy of this statement shall be furnished to each Negro applicant for employment and membership, and once each three months copies of all these statements shall be furnished to the plaintiff.

13. Local 357 shall once a month for six months, following the entry of this decree, and quarterly thereafter, place advertisements in all daily or weekly newspapers serving the Las Vegas Negro community, describing the work opportunities available through Local 357, the procedures for obtaining such opportunities, and stressing that such opportunities are offered on a nondiscriminatory basis. Every three months copies of such advertisements shall be furnished the plaintiff.

*Specific Relief*

14. Notwithstanding any other provisions of this order, if it has not already done so Local 357 shall contact the following Negro electricians and offer them immediate work referral and journeyman wireman or lineman membership in the construction unit and report the results of the offer to the plaintiff:

| | |
|---|---|
| Samuel Baynes | Rudolph Pittman |
| Willie Bowens | Roy Riller |
| Sam Douglas | Eugene Staten |
| Albert Henry Goff | C. L. Strambler |
| Earl McDonald | Lee Charles White |
| | Phillip White |

*Jurisdiction*

15. The Court shall retain jurisdiction of this case for such other relief as may be necessary or appropriate to further effectuate equal employment opportunities. At any time after March 1, 1978, the defendant may move this Court for modification or termination of

this order, provided it can demonstrate that the effects of its past policy of racial discrimination have been overcome and that its current and future policies are designed to insure that no person is denied the rights which this order seeks to protect.

## DECREE, DEFENDANT JOINT APPRENTICESHIP AND TRAINING COMMITTEE FOR THE ELECTRICAL INDUSTRY

The Court, having filed its findings of fact and conclusions of law on October 18, 1972, now enters the following decree.

It is hereby ordered, adjudged and decreed as follows:

1. Defendant Joint Apprenticeship and Training Committee for the Electrical Industry (hereinafter JATC), its officers, agents, employees, successors and all persons in active concert or participation with them in the administration of the electrical apprenticeship program, are permanently enjoined from engaging in any practice which has the purpose or effect of discriminating on the basis of race or color, or of perpetuating the effects of past practices which discriminate on the basis of race or color. They shall recruit, receive applications, evaluate, select applicants and otherwise administer all the JATC programs so as to provide opportunities to Negro and other non-white applicants and participants which are equal to those provided to whites, and otherwise administer all the JATC programs so as to provide opportunities to Negro and non-white applicants and participants which are equal to those provided to whites.

*Apprentice Selection*

2. To apprise Negroes residing in the geographical jurisdiction served by the JATC of the requirements and procedures for admission to the JATC program, the JATC shall place commercial advertisements outlining the requirements of the program, the beginning apprentice rate of pay and the journeyman scale, the location and business hours of the apprenticeship office and including at the head of the advertisement a statement of the equal employment opportunity policy of the JATC. Such advertisement shall appear once every three months in all daily or weekly newspapers serving the Las Vegas Negro community. Every three months copies of such advertisements shall be furnished plaintiff. The JATC shall also offer to participate in Career Day exercises and similar programs at high schools in Clark County, Nevada, and shall personally contact high school counselors and placement officers at these high schools to advise them of the nature of and requirements for the JATC programs. It shall be emphasized that the program is open to all on a nondiscriminatory basis.

3. The defendant JATC shall maintain a list of qualified apprentice applicants. With respect to Negro applicants, defendant JATC shall consider all persons qualified for selection who meet the following standards:

(a) Age: Between 18 and 30 years of age.

(b) Education: High school graduate or the equivalent, General Education Development certificate.

(c) Tests: Passing score on the General Aptitude Test Battery.

(d) Physically fit for electrical work.

4. To overcome the present effects of past discriminatory practices within the Construction and Hotel Maintenance Unit, the defendant JATC shall, to the extent that there are Negroes on the list of qualified apprentice applicants, select one Negro apprentice for each three other apprentices selected until the number of Negroes in the Construction and Hotel Maintenance Unit shall equal 12½% of the total membership of that unit. Negroes whose apprenticeships terminate in six months or less shall be replaced with newly indentured Negro apprentices to the extent necessary to insure the required participation by Negroes.

*Specific Relief*

5. Defendant JATC shall personally contact Edward Collins, Robert Brewer, Curtis Crockett and Odell Nichols, Jr., and offer each of them the opportunity of entering the next apprenticeship class without further testing, interviewing or other screening, and report the results of the offer to the plaintiff. They shall not be counted as part of the defendant's obligation under paragraph 4.

*Special Training*

6. The JATC shall give special counseling and supplemental instruction to all apprentices who show a deficiency in required subjects to assist them in their goal of achieving passing grades.

*Records and Reports*

7. The JATC shall maintain complete records of all applications and other materials concerned with the selection and work records of apprentices for the life of this decree. These records shall include an apprentice application log for each apprentice selection period showing the name, race and date of birth of each applicant, and dates of completion of each step in the application procedure and the disposition of each application. All such records shall be made available for inspection and copying by plaintiff at reasonable intervals during normal working hours or at other mutually convenient times without further order of this Court.

8. The JATC shall submit to this Court and to the plaintiff each three months for the life of this decree a report detailing its efforts taken in conformity with paragraph 4 of this order. The report shall state the number of persons who filed applications during that period, and the names, addresses and telephone numbers of all Negro applicants. For any Negro applicant who is rejected or whose application becomes inactive during the reporting period, the report shall state the reasons therefor. For each Negro apprentice, the report shall show his work history during the reporting period, including the date of each referral, the name of each employer to whom he was referred, and the number of hours worked for each employer during the reporting period.

9. If any Negro apprentice drops or is dropped from the JATC program during the life of this decree, the JATC coordinator shall submit a report within ten days to the plaintiff, stating the reason why the individual left the program and any steps taken by the JATC to retain the individual in the program. The report shall also include the school and employment history of the individual while he was in the program, including the names of the employers by whom he was employed.

*Jurisdiction*

10. The Court shall retain jurisdiction of this case for such further relief as may be necessary or appropriate to further effectuate equal employment opportunities. As soon as the number of Negroes in the Construction and Hotel Maintenance Unit of Local 357 shall equal 12½% of the total membership of that unit, the defendants may move this Court for modification or termination of this order, provided it can demonstrate that the effects of its past policy of racial discrimination have been overcome and that its current and future policies are designed to insure that no person is denied the rights which this order seeks to protect.